Stewart W. Emmons for the plaintiff appellant. I'd like to reserve three minutes for rebuttal, please. We ask that the court reverse the district court's order granting defendants motion to dismiss. Plaintiff here has alleged a plausible claim for securities violation. Now, this case arises out of UTI's highly troubled $100-plus million effort to overhaul its operating systems with OneView, which was its straightforward operating system, and with Oracle Financial. Now, UTI claimed that this is going to save the company $95 million every year when fully implemented in around fiscal 2016. But, as the confidential witnesses make clear and defendant's own admissions, throughout the class period, UTI's OneView Oracle systems were failing their primary function, and that is to capture and transfer financial data. Now, this caused significant problems, according to the witnesses, including significant invoicing delays, major problems with account reconciliation, recognizing revenue, inadequate control of financial reporting, and a serious liquidity crisis that resulted from the invoicing delays, which created a $40 million backlog of accounts receivable with the United States implementation alone. Now, these were extremely serious consequences, regardless of what defendants says. The confidential witnesses described it, for instance, as significant, ongoing, pervasive, a big issue. And when disclosed, the price dropped? I'm sorry? And when disclosed, the price dropped, right? Yes, it did. It dropped February 26th. So, I understand that theory. What I may not, what I have some difficulty understanding is the accounting theory, because the price dropped, and then the disclosure about the alleged accounting irregularities comes later. Well, it was really, it was a disclosure about material weaknesses and internal control over on February 26th, at the same time that the other disclosures were made. And let me tell you why. The reason is that on February 26th, UTI announced problems with, quote, implementing shared services, end quote, accounting functions, and two significant, quote, invoicing delays, end quote, which prevented UTI from properly recording accounts receivable. But then on March 31st, when the material weakness was announced, they, the company attributed the internal weakness, the material weakness to the exact same problems that were disclosed on February 26th. For instance, it was insufficient, quote, shared services, accounting resources, end quote, and UTI's inability to effectively record accounts receivable. So in substance, the material weakness was disclosed on February 26th at the same time as the rest of it. And the fact of the matter is all these problems, the internal control problems, they're, they all spring from the implementation and really from the invoicing issues, which caused them so much trouble. They couldn't reconcile their accounts and close the general ledger, which those things are connected. They couldn't bill their customers, and they couldn't collect receivables, and that's a serious deal for a company. What's more important than getting out your billings and collecting receivables? If not, you run out of cash, and that's exactly what happened here at the end of the class period when there was the liquidity crisis. The company was forced to undertake a highly dilutive offering. They violated their debt covenants, and then their auditor, Deloitte, came out and amended their prior audit opinion to say there was substantial doubt that the company would be able to continue in business for the next 12 months. Now, that's what happened as a result of these implementation problems. But let me tell you what the defendants, some of the statements that the defendants made. For instance, despite all these problems, I say the systems are, quote, performing well, achieving the right processes around the transfer of information, proven to work and take the cost out, especially with the U.S. going live. And then as late as December 5th, 2013, and this is after the whole thing has gone south in the U.S. and the problems are getting worse. So Kirshner, he says, quote, OneView Oracle is functioning and working, and we're seeing the benefits that we expected in terms of how that system performs, end quote. But as I just said, they weren't working, and there wasn't any cost savings. What is your argument about what the district court did wrong? Is it about what the district court did wrong? What specifically are the errors that you claim the district court made? Well, the district court threw us out across the board, so we're claiming the district court missed it on CNR, they missed it on the PSLR, but not all the statements fell under each one, but she went through and mixed and matched, and there's not a, the order's kind of sparse, and there's not a lot of reason. So there's PSLRA safe harbor, there's materiality slash puffing, if you want to call it, there's CNR, and then there's loss causation. So those are the issues that the court threw out various of the statements based on these reasons. So I'll try to, you know, I got a lot of issues, so, but I'll try to hit on a few of them. But you know, UTI, they, I mean, they admitted, they admitted all these problems at the close of the class period. For instance, here's one, quote, UTI's liquidity has decreased significantly over the last several fiscal quarters, primarily as a result of invoicing delays in connection with the rollout of OneView Oracle. And at the same time, they also, the no changes had occurred that were, were, or were reasonably likely to affect control over confidential reporting. And this is at the same time when all the count reconciliation in the general ledger had been listed as significant deficiencies, and when Deloitte had raised the problem. This is a pretty serious control problem you've got going here. I'm going to hit on materiality just real quick. And this was highly material to defendants. They talked about it at all the conference calls, press release, the financial reports, and analysts asked about it all the time. And one analyst said during a conference call, says, quote, quote, or if the implementation is, quote, successful, the stock's going to be a lot higher than $15, end quote. And importantly, these are objectively verifiable statements about the progress and effectiveness of this key initiative, OneView. Like statements like, quote, the system is performing as we would expect it to right now. The context is important here too. Casella versus Webb makes this quite clear. The context is while UTI's, these statements are made, UTI's touting these $95 million benefits they're going to get, and the incremental benefits they're saying they're starting to achieve along the way. So the fact that they're meant to emphasize this makes these statements even more material. And then again, the omissions are highly material. That's matrix Kaplan v. Rose, matrix Supreme Court, and then the Ninth Circuit case. These are highly material, which makes them, goes into the equation as well. And it's really, you know, a serious liquidity crisis, not being able to even get invoices. That's highly material. I'm going to hit this forward-looking statement, the safe harbor real quick. And the court found that a few of the statements were protected by the PSLRA safe harbor. But the main problem, the first problem is that the statements that we were challenging, they simply were not forward-looking statements. They were statements about past facts, about the effectiveness of one view oracle. And so that just rules the safe harbor out altogether because it's not forward-looking. Ninth Circuit's many cases say statements of past and present facts simply just aren't forward-looking subject to the safe harbor. And then the second part, assuming some of these so-called forward-looking statements, which they're not, you know, if there are such things here, the cautionary language here was not, it was not meaningful. It was just, it was so generic that you could literally put it out in any, for any new initiative for any company. You know, it's basically we could have problems if the systems, you know, go bad. And they actually referred to them as, they called them, quote, unanticipated, unquote, problems as well. So, oh, and one last point here is that the warnings they were making were, they said problems may occur. These are the cautionary language. We could get these problems, but these problems were already, you know, really going at the time they made the statements. So let's move to CNR. And we've got CNR through, we've got it a couple of ways. Direct knowledge, we've got a lot of allegations of direct knowledge. But then we also have the core operations because of the importance of this to the company. And the fact that really everybody in the company knew about it, it's clear. And the only way the court was able to find there wasn't CNR here is she disregarded, she disqualified 14 of our 15 confidential witnesses, and they were described with particularity. And some of these guys, I mean, there was no precedent for it really in any court. And it's contrary to Zucco, it's contrary to Dow, it's contrary to a bunch of nice circuit cases. But a lot of these guys were senior executives. They communicated directly with the defendants. So take this CW15. I'm going to hit a couple of, two or three of the better ones. So he's the President of the Americas. This guy's a very senior guy. He's in charge of one of the four divisions. He met with Kirshner, Roddick all the time. So he says, Kirshner, Roddick, and Feitzer were aware, quote, without question, end quote, of the OneView Oracle issues, and that including the failure of OneView to communicate with Oracle, and that this caused a serious lack of visibility into the financial data. So CW15 said these issues were discussed in meetings with these three. These are the three main defendant executives. These were, quote, discussed at every executive board meeting, on many conference calls, and other meetings, end quote. And so CW15's in these meetings with these guys, and he knows what they're talking about, and he knows the concerns. Quote, a general topic, end quote, of concern at these meetings for the executives including these three guys is that the OneView Oracle problems that the company experienced in the early rollouts were going to cause a big problem when the U.S. came out, and the U.S. was their biggest one. And so, well, that's what happened. And we've got their CW, on top of CW15, we've got CW3. CW3 says Roddick, he's the CFO, knew about these problems through biweekly emails that both Roddick and CW3 received through a detailed briefing he got in April 2013 in a June 2013 meeting, and Roddick actually tried to help develop a workaround to fix the OneView, and that didn't work, of course. But that came out of that, and CW3, CW9, another one of our guys, were trying to help implement this, and it didn't work. CW9 says, he's a director of finance internal audit, he says Roddick participated in the Sarbanes-Oxley meetings, you know, talking about controls and stuff, leading up to the class period, and just into it. And so Roddick's at all there to tell him about the general ledger closing and accounts reconciliation problems and how these are creating control issues. And so Roddick acknowledges the problems by, you know, he said, you know, we'll look into the issues, more or less, is what he said. And these are also listed as significant deficiencies in each of the audit reports that Roddick put out during the class period. These didn't go directly to the defendants, but they went to some really high-ranking guys who reported to the defendants. Chief Information Officer Berger, Ronco, a very senior finance person, and another one. And the most prominent issues in these reports are the communications failures, in that data's not properly flowing from OneView to Oracle, and the invoicing issues. And of course, those are all interrelated. It's all a communications problem. You know, that's causing the whole wreck. And we have corroborating witnesses in CWA to places Roddick, Kirshner, Feitzinger in meetings in the fall of 2013 when the issues were discussed. CW10, who puts Kirshner at least one meeting early on in 2012 when the issues were discussed. And then CW15, who says all the executives, they're all talking about it at all the meetings about the problems, and they're concerned about it. And then we've got corroborating witnesses who maybe don't get quite as close to the defendants, but they confirm the persistent and widespread problems at the company, as well as the defendants' admissions. And I mentioned one earlier that, for instance, quote, the invoicing delays, end quote, occurred, and quote, receivables, as expected, rose in almost every country where OneView had been implemented. So everybody knew about the problems, including the senior executives like CW15 and CIO Berger. And the defendants will have you believe that Kirshner, Roddick, Feitzinger didn't know about it, even though they were at all these meetings when the issues were discussed. You're down to about a minute and a half. Do you want to reserve? Yes, I'll reserve the rest. Thank you. May it please the Court, Gary Bornstein for the defendants' appellates. I'd like to start, if I could, with a question that Your Honor asked Judge Thomas about the different theories, the accounting theory versus the theory around the invoicing delays and the implementation of the OneView system and the collection of cash. And I think that goes to an important issue in thinking about the case, which is there needs to be a statement with respect to which each of the elements of 10b-5 is satisfied. It's not enough to mix and match, to say I've got C-enter with respect to this statement, and I've got falsity with respect to this statement, and I've got loss causation with respect to a third or one of those but not the other. And as you parse through the tangle of statements and allegations in the complaint, I submit you cannot find one where you can draw that thread with respect to any one statement. And so to take the example of the accounting issue in Your Honor's question, that information was disclosed after the class period was over. And I say that information, I mean the information about the weakness in the company's internal controls. That did not come out until March of 2014, after the class period was done. Counsel referred to a statement in the February 26th disclosure, which is when the stock did go down quite a bit, which was that there was difficulty implementing shared services. I'm going to stop there, because counsel said implementing shared services and accounting resources. That is not what's in the actual disclosure that the company made. The company's actual disclosure is that there was difficulty in implementing shared services. There is no reference in the February 26th disclosure to accounting resources. In fact, as the company the statement goes on. Why is that significant? The stock dropped? The stock dropped because there was a wide range of news that was announced, including primarily the liquidity problem that was disclosed. The company did a refinancing of its debt. It issued a lot of new equity. And that's what caused the stock to decline. And in terms of the causes of the liquidity shortfall that led to the financing, the company listed four in the disclosure, three of which there's no dispute were disclosed all along the way. Losses that the company had incurred, which had been disclosed every quarter in its regularly filed financials. So they didn't cause the drop? The disclosure, I'm sorry. If you said the ones that were disclosed all along could not have been the cause of the tanking of the stock. Correct, Your Honor. That is my point. So that information had been disclosed, information that the company had had to get waivers and amendments to its debt covenants, that was disclosed every quarter. In the February 26th disclosure, when the stock did drop, there's a reference to capital expenditures that were associated with this transformation process. Those had been disclosed every quarter, what the company's capital expenditures were. Severance expenses are referenced. Those were disclosed every quarter. What does that leave as the cause of the drop? Well, what it leaves, I believe, Your Honor, as the cause of the drop is that this liquidity problem got so severe that the company had to engage in this financing. Each of these problems accreted over time, and it got to the point where the company's lenders were not willing to amend the debt covenants again or give them any further forgiveness, so the company had to do a more drastic financing transaction. And the fourth item for completeness that is listed are the invoicing delays, which are obviously the subject of a number of plaintiffs' compliance. And that goes to, again, Judge Thomas' question about the difference in statements. There is a clearer basis, I acknowledge, for alleging loss causation with respect to the invoicing delays. I'm not saying clear enough, but just for the sake of clarity, it's clearer, certainly, for the invoicing delays because that's something that was announced on the day. The accounting issues were not announced on that day. There is no reference to accounting issues in the disclosure on February 26th when the stock declined. The reference there is to difficulties in consolidating the company's information, consolidating the new processes and the shared services, but then it goes on to talk about how the impact of those problems was difficulties in serving clients and difficulties in meeting the needs of the company's customers. So walk me through your theory about why the disclosure of invoicing delays isn't sufficient to survive a motion to dismiss. So with respect to the invoicing delays, there's the loss causation issue, which maybe I'll park to the side for one second, but it is part of the theory, but there are also the scienter and the falsity issues. So I'm not clear if Your Honor would like me to address No, I just, you said you want to parse it out. I'm just, I'm giving you a parse. I'm trying to parse it for your remaining time. Okay. So take the invoicing delays as the putative cause of one of the causes of the stock drop. Tell me why that isn't sufficient for them to go forward. Understood. So I think the I know you have a number of theories, but why don't you walk through them? Sure. I'll start with scienter, Your Honor, which I think is a critical failing really throughout the complaint, but certainly with respect to the invoicing delays, even more prominently than with respect to the internal controls issues. It's kind of flipped. So with respect to the invoicing delays, first of all, the statements that are alleged generally are their characterizations. And counsel did a recitation of a number of them in his portion of the argument. This is working well. We have systems in place. We have a platform from which we can grow and put more volume on the system. There are no hard pronouncements about we are able to get our invoices out on time. We are, we are, we have a sufficient amount of volume on the system, for example. I'll take that. Well, the, the, the, the IVU system, the whole purpose of it was to generate, was to, to ultimately generate invoicing. Well, Your Honor, that's one purpose of the system. The timely generated. I apologize. The timely generated invoicing. Yeah, generating invoices was one thing that the system was supposed to do, but it's hardly the only thing that the system intended. I know, and it failed. The system failed in a sense. Well, it's alleged that the system did not generate invoices in a timely way in certain periods of time in certain geographies. That's correct. But it, it's a very large leap to then say that that means the entire OneView system was a failure. If you look at paragraphs 26 and 27 of the complaint, they explain that what OneView was intended to do was to stitch together a variety of businesses that had been acquired over time and to create one platform so that if I'm in China and I'm entering something in the system for a shipment that needs to get to the port in Los Angeles or the port in Long Beach, that the person who's sitting in Los Angeles or Long Beach is using the very same computer system and they're talking to each other and the information about what's leaving China and what's getting to Long Beach is actually being communicated. And that was happening. And there's no challenge to the fact that that was happening. Every quarter the defendants made statements about how much volume was getting on the system. They made statements about the number of countries that had gone live. And there's no challenge to the accuracy of any of that. And so when you put in context the statements about the system working, the system having a platform in place, it did. Invoicing was one among many pieces of this large system that the company was putting in place to transform and centralize and unify its businesses. What about a statement, for example, that I view as performing well? Or the system is now ready to scale so the system itself will be able to handle the additional transactions as we add volume to it? Yes, Your Honor. I think both of those statements are true. And with respect to, I mean, to get to the other issue about it, right, there's, first of all, there's puffery. These are general statements which have context around them with respect to statements that Mr. Kirchner and Mr. Rodek made about the difficulties they had with linkage, with respect to differences that they experienced in different geographies. And an investor doesn't rely, as the cases repeatedly say, on general statements about things are going well, we've got the right processes in place. These are not the kind of hard pieces of information that investors take to heart and rely on. They understand there's a certain degree of optimism and general description that executives give in these types of conference calls. And they don't form the basis for investor decisions. But with respect to Center, if I could make sure I hit that part. I think you have the witness. You have to piece it together on their theory. Probably their best Center witness is CW15, who didn't talk about, I think, if recollection serves, the invoicing problems, but did talk about the management structure and said they received regular reports. Correct. So CW15 did talk about the fact that there were reports, doesn't talk about what those reports related to, doesn't talk about the content of what people were informed in terms of whether there were invoicing delays and of what severity. I think that's an important point as well in terms of assessing the Center of an individual who stands up and says things are going well. Those things wouldn't be discussed at those meetings? Well, there's no allegation, Your Honor, about whether there's anyone who's told that there is a severe invoicing delay. I mean, to put this in context, counsel referred to a $40 million bubble that created. That's on $1 billion of revenue every quarter for this company. So we're talking about 1% of the company's annual revenue. So to pitch it as a massive problem that would necessarily be discussed with great detail at an executive meeting, I think, is probably not a reasonable instance. But this will result, the problem was this, what have you called this, software, the iView, the system and the manner in which it was operating and the significant problems it was having. One wouldn't expect that that would be discussed at these meetings. Well, Your Honor, you can, I suppose, draw an inference that there is information about the progress of 1View being discussed. The inference, I think, is an inference too far, is that anyone was informed that there were problems of the kind of severity that would transform a statement of, well, this is going well, into intentional, deceptive, deliberate wrongdoing on the part of the executive who made that statement. Because that's really the allegation in terms of Sienter. The cases are very clear that it's an intentional act or at the very least deliberate recklessness, which is an extreme departure from the ordinary standards of care. And so if you think about the fuzziness and generality of the statements that are made, I think you need to have, in order to demonstrate Sienter, some pretty hard, clear allegations that there was information provided to the executives who made these statements that the problems weren't just ordinary growing pains and there were some delays that lasted for a few months when things rolled out in the United States, but then we got it under control and it was a 1% problem here. But I think you need to have real, clear allegations that there were problems of sufficient severity that could lead to what ultimately, unfortunately, happened to the company. And there's no allegation, certainly from CW15, that there was any information like that shared. In fact, to the contrary, CW15 didn't even mention invoicing delays. CW15 talked about system slowdowns, which when too many people got on the system, apparently it got a little slower to put in your information. And he talked about linkages between OneView and the financial side of it, of Oracle. But, again, there's no... Ultimately, there was no issue the company had in actually accounting for its financials. There's no allegation that financial statements were ever misstated. There's no allegation that there was any revenue recognition problem, though you'd be hard-pressed to figure that at various points in the complaint. And there's no allegation that any of the projections or other financial information that the company issued and provided to investors was ever anything other than accurate. And so all of the allegations about the problems with revenue recognition and with internal controls, those never came to pass, because at the end of the day, there never was any issue with the company's accounting. No loss was caused as a result. I see I'm getting very low on time. I'd say just with respect to the confidential witnesses, what I think is missing, importantly, from the complaint, is a link to the defendants from anything that those confidential witnesses say. And I'd point out, in particular, defendants Feitzinger and Misaki, about whom very, very little is said, but even for defendants Kirchner and Rodick, the tie between the information that they would need to have been told in order to make their statements false and what they are alleged actually to have been told. There's a very, very, very large gap. And I see my time is up. I'll sit down unless the Court has any questions. Thank you, counsel. Thank you, Your Honor. Okay, I guess I'm going to have to be quick here. So let me just go back to loss causation real quick. What the February 26, 2014 disclosure... what it revealed, it revealed two things. It revealed the fraud by disclosing the significant problems, and that includes the, quote, invoicing delays, end quote, from the implementations, and the materialization of the risks concealed by the fraud. And that's including the liquidity crisis, violation of debt covenants, and dilutive offering. The stock dropped 30%. Loss causation is played here under Dow because, quote, one substantial cause of investor losses were the misstatements. Defendants specifically admitted that the invoicing delays caused by the implementation was one of four causes. So we've got that. Now, and also, I talked earlier about how the shared services... Shared services is the accounting function, pretty much. That's the way all the witnesses talk about it. We've got it in our brief. And... what happened is that... it was not just that it concealed an accounting discrepancy, but what it actually did, it concealed the overarching problems of the implementation, including the invoicing delays, because the invoicing delays and everything else is at the heart of communications problem. And so... And so that's what... It disclosed all the problems, basically. If they disclosed the internal control problems, it would have basically been... it would have revealed the rest of it. So what we have here is, but for the circumstances that the fraud concealed, investors would not have lost their money. If so... Thank you, counsel. Your time has expired. I realize it's very short, but we've read your briefs thoroughly, and we thank you all for your arguments. The case just heard will be submitted for decision.
judges: Reinhardt, Thomas, Korman